**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AMERISOURCEBERGEN DRUG** | : | |
| **CORPORATION** | : | |
| | : | |
| v. | : | **CIVIL ACTION NO.  16-6106** |
| | : | |
| **PRIMROSE PHARMACY, LLC,** | : | |
| **ET AL.** | : | |

---

**McHUGH, J.**                                                            **November 30, 2021**

### MEMORANDUM

This is a non-jury case arising out of a contract dispute between an independent pharmacy and the intermediary that provided claims payment processing and network access for the pharmacy.  That pharmacy, Defendant Primrose, and its principals have sought to avoid paying Plaintiff AmerisourceBergen Drug Corporation ("ABDC"), the intermediary pharmacy services administration organization ("PSAO"), for debts incurred pursuant to the agreements between them.  Specifically, Primrose disputes its obligation to pay back ABDC for an audit recovery charge paid by ABDC on Primrose's behalf to a third-party, Caremark, on the grounds that Caremark improperly submitted the charge through ABDC. The relationships between these parties are defined by a complex series of interlocking agreements. An arbitration between Primrose and Caremark recently concluded, and ABDC now moves for summary judgment on the basis of its agreements with Primrose.

Having carefully reviewed the controlling contracts in light of the record, I conclude that ABDC made the payment in dispute on Primrose's behalf to Caremark pursuant to authority expressly granted to it by Primrose.  Under the terms of the parties' agreements, I therefore find that Primrose is in breach of its duty to reimburse ABDC for the contested payment.  For reasons

discussed below, I also conclude that the 18% interest provisions and the litigation costs and attorneys' fees provisions of both the Credit Agreement and the Master Program Agreement apply to the debt at issue, that Defendants Karl Blass-Schutz and Karl Bucholz are liable for the debts pursuant to their Personal Guaranty, and that Defendant Althea Group, LLC, is also liable pursuant to the guaranty it signed.  Given the clarity of the agreements and lack of any material issue of fact, I will grant Plaintiff's Motion for Summary Judgment on Counts I, III, and IV of the Complaint in full.

I. **Factual Allegations and Procedural Posture**

A. The Agreements

On January 14, 2013, ABDC and Primrose initiated a business relationship that would continue until the events that gave rise to this prolonged dispute in late 2016.  The relationship began with a Credit Application, Credit Agreement, and a Personal Guaranty signed by Defendants Karl Blass-Schutz and Karl Bucholz, who were the principals of Primrose. ECF 111-1 at 2 (Credit Application), at 3-5 (Credit Agreement), and at 6 (Personal Guaranty).  The Credit Agreement provided the basic mechanism by which ABDC could charge Primrose for goods and services that Primrose obtained through ABDC.  The terms of the Credit Agreement, on their face, "appl[ied] to all purchases of goods and services" absent a superseding agreement.  Credit Agreement ¶ 1.  It contemplated the possibility of chargebacks submitted by third-party manufacturers and buying groups, *id.*, established ABDC's right to security interests, *id.* ¶ 2, and required the maintenance of "insurance sufficient to cover all indebtedness to ABDC," *id.*  ¶ 3.  Importantly for this dispute, it included an 18% APR interest fee for late payments, *id.* ¶ 1, and a fees and costs provision related to any collection efforts, *id.* ¶ 6.  It concluded with a standard integration clause, limiting the terms of the contract to the understandings set forth in the agreement.  *Id.* ¶ 12. The Personal Guaranty

was signed at the same time as the Credit Agreement and was expressly identified as "an inducement for [ABDC] to extend credit to Applicant."   ECF 111-1, at 6.   In the guaranty, Defendants Blass-Schutz and Bucholz agreed to "guarantee, as sureties, to ABDC … the prompt and full payment (and not merely the ultimate collection) and performance of all Obligations (as defined in the attached Credit Agreement) of Applicant to ABDC."   *Id.*

In the beginning of February 2013, Primrose and ABDC entered into an additional series of agreements that provided Primrose access to the Pharmacy Services Administration Organization ("PSAO") network that ABDC managed.   These agreements included the Master Program Agreement ("MPA"), ECF 106, Ex. C, and the Elevate Term Sheet, ECF 106, Ex D. (collectively the "PSAO agreements").   The MPA included provisions for Primrose's obligations to pay fees and other costs associated with participation in any given Pharmacy Benefits Manager ("PBM") network, MPA ¶ 4, as well as interest penalties for late payments, *id.*, Ex. C  ¶ 2.0.   It also indemnified ABDC, *id.*, Ex. C ¶ 6.0, and provided for litigation costs and attorneys' fees, *id.*, Ex. C ¶ 8.6.   Around this same time, a series of agreements were either already in effect or then entered into between ABDC and Caremark, and between Primrose and Caremark.   These agreements granted Primrose the capacity to submit pharmacy benefits claims to the Caremark Network, for which Caremark acted as the PBM. These agreements included the Caremark Provider Agreement between Caremark and Primrose, ECF 109-6,[1] the Administrator Agreement between Caremark and ABDC, ECF 109-4, and the Agency Addendum to the Caremark Provider Agreement between Caremark and Primrose, with the signed consent of ABDC, ECF 109-5.

---

[1] The record also includes the CVS/Caremark Provider Manual at ECF 109-7 (first half) and ECF 109-16 (second half), which expands upon the Provider Agreement and details, among other things, the process for submitting prescription benefits claims. Its relevance to the present dispute is limited to the termination provisions that governed Primrose's participation in Caremark's program.  ECF 109-7 at 34.

Taken together, these agreements governed Primrose's access to Caremark's service as a PBM and ABDC's role as Primrose's agent and payment processor when accessing that service. Caremark, as a PBM, provided an interface between insurance companies and pharmacies. Pharmacies make claims to Caremark as a PBM for prescription medicines sold to insured individuals and Caremark in turn processes those claims, reimburses the pharmacies, and charges the insurance plans. The key service in this exchange that ABDC provides as a PSAO is to enroll independent pharmacies in PBM networks, such as Caremark's, and act as a payment processor between the pharmacies and the PBMs. As a PSAO, ABDC thus streamlines reimbursement processing for independent pharmacies and enables efficiencies in payment reconciliation with the PBMs by aggregating many smaller pharmacies into a central accounting mechanism. In the agreements at issue, the central accounting mechanism was referred to as "Central Payment."[2]

The Central Payment mechanism formed a core element of the agreements among the parties. In the Administrator Agreement, ABDC and Caremark agreed that ABDC, as the agent of all the individual pharmacies, would use Central Payment to collectively reconcile the aggregated accounts of all the pharmacies in ABDC's PSAO network that made claims through Caremark. ECF 109-4, ¶ 1(a) ("Administrator further represents and warrants to Caremark that it has the requisite legal authority to act on each Participating Provider's behalf to receive all payments made by Caremark for Pharmacy Services performed by Participating Provider ('Central Payment') pursuant to the Provider Agreement. The Central Payment is an aggregate payment representing the amounts payable to all Participating Providers who have designated Administrator as their agent for Central Payment pursuant to that Agency Addendum."). In the Elevate Term

---

[2] Some of the contracts refer to the mechanism as "Central Pay" and others as "Central Payment." For simplicity's sake, I will solely refer to it as "Central Payment" except when quoting specific contractual language where I will preserve the original.

Sheet, Primrose agreed to ABDC's use of Central Payment for the payment of claims from PBMs like Caremark that used Central Payment.  ECF  106, Ex. D, ¶ 3(a) ("ABDC enters into Payor Contracts on behalf of the Elevate Network and arranges for payment of Claims through Central Pay.  Payor Contracts, including those with Central Pay, take effect for each Pharmacy as Payors recognize its participation.").  And in the Agency Addendum, Primrose appointed ABDC to act as its agent in reconciling its account with Caremark through Central Payment, with express reference to Central Payment's mechanism of using an account balancing between ABDC and Caremark that aggregated all pharmacies within ABDC's PSAO network.  ECF  109-5, ¶ 1(a) ("Provider hereby appoints Administrator as its agent to receive all payments that Caremark may make from time to time for the Pharmacy Services performed by Provider pursuant to the Provider Agreement ("Central Payment").  The Central Payment is an aggregate payment representing amounts payable to all providers, including the undersigned Provider, who are participating in a Central Payment arrangement with Administrator.").

These agreements were also clear that the Central Payment mechanism permitted Caremark to offset monies owed by individual pharmacies for overpayments or, as in the case here, audit recoveries, through the aggregate mechanism:

- "Any overpayments made to Provider by Caremark may be deducted from amounts otherwise payable to Provider."  Provider Agreement, ECF 109-6, ¶ 5.

- "Caremark may offset against all or any portion of a Central Payment amounts owed by any Participating Provider to Caremark, including without limitation, amounts owed as a result of audit recoveries, claims reversals or adjustments, or fees."  Administrator Agreement, ECF 109-4, ¶ 1(a).

- "Caremark may offset against all or any portion of a Central Payment amounts owed to Caremark by any provider (and not limited to the undersigned Provider) affiliated with Administrator in a Central Payment arrangement, including without limitation, amounts owed as a result of audit

5

> recoveries, claims reversals or adjustments, or fees."  Agency Addendum,
> ECF 109-5, ¶ 1(a).

And under the Elevate Term Sheet, Primrose agreed "to reimburse and indemnif[y] ABDC for any offset taken by [Caremark] for a Claim against [Primrose] and ABDC may reduce or delay other payments to [Primrose] … if anticipated offsets or adjustments may create a negative balance." ECF 106, Ex. D, ¶ 4(b).

The Administrator Agreement and Agency Addendum detail the scope of duties that ABDC undertook, on behalf of Primrose, in administering the payments for Primrose's claims submitted to Caremark.  These principally included the enrollment and disenrollment of Primrose in the Caremark network and the receipt of payments from Caremark through the Central Payment mechanism.  ECF 109-4, ¶¶ 1, 1(a).  The Elevate Term Sheet reiterates these duties.  ECF 106, Ex. D, ¶ 3(a) ("ABDC enters into Payor Contracts on behalf of the Elevate Network and arranges for payment of Claims through Central Pay.").  Importantly, however, that term sheet also expressly limits the scope of agency duties as related to disputes in two separate places stating that ABDC does not "resolve reimbursement, payment, audit and other disputes" arising between Caremark and Primrose, *id.* ¶ 3(c), and further stating that "[Primrose] is solely responsible for its relationship[] with [Caremark], including responding to, defending and resolving such disputes (including legal expenses) and paying any amounts owed as a result of such dispute," *id.* ¶ 4(b).

B.  <u>The Dispute</u>

The key dispute in this case arose after Caremark conducted an audit of Primrose's previously submitted claims over the summer of 2016 and found $3,105,000.00 in purported overpayments made to Primrose.  Blass-Schutz Testimony 117:5–8, ECF 106, Ex. A.  Caremark charged Primrose through ABDC's Central Payment mechanism $3,088,210.00 (the difference offset by other claims) in October 2016.  Primrose challenged the audit and submitted additional

6

documentation, in response to which, in April 2017, Caremark reimbursed $1,737,640.55 to Primrose via check to ABDC.  *See* Statement, ECF 106, Ex. F (showing value); Email of March 22, 2017, ECF 109-14 (showing request from ABDC to Caremark for check).   After offsets from other payors to Primrose in Central Payment, Primrose had an outstanding balance of $1,301,254.50 to ABDC. *See* Statement, ECF 106, Ex. F at 5.  ABDC requested payment from Primrose on this balance and despite Primrose's seemingly explicit obligation under the agreements "to reimburse and indemnif[y] ABDC for any offset taken by [Caremark] for a Claim against [Primrose]," Elevate Term Sheet ¶ 4(b), Primrose has refused to pay.  ABDC here seeks such payment and argues that it may also recover interest and fees and costs pursuant to provisions of the MPA and the Credit Agreement.  Pl. Br. at 13-14, ECF 106.  ABDC further argues that the personal and corporate guaranties can be enforced as to these debts against Defendants Blass-Schutz, Bucholz, and Althea Group.  *Id*. at 15-17.  The principal amount is not in dispute.  The arbitrator in the related proceeding found that Primrose's obligation to Caremark could not be disputed: "Primrose … failed to meet its burden of proof that the $1,347,661.17 paid to Caremark and collected from ABDC through Central Payment was in any way an inaccurate amount, and indeed Primrose has essentially conceded that for purposes of this arbitration.  Thus Primrose has retained what is deemed and found to be $1,347,661.17 of overpayments."  Arbitrator's Award, ECF 106, Ex. G.

Primrose's core defense is that ABDC breached the agreements in the first instance by making the initial $3 million payment to Caremark through the Central Payment mechanism without the authority to do so, absolving Primrose of its obligation to repay ABDC. Specifically, Primrose argues that Caremark improperly charged the Central Payment system *after* terminating Primrose from the affiliate network, which Primrose contends was a violation of the Administrator

Agreement.  It follows, Primrose argues, that ABDC breached its duties as Primrose's agent when it paid the audit recovery charge that Caremark improperly made through Central Payment.  Def. Br. at 7-10, ECF 109.  In Primrose's view, ABDC should have pursued a remedy from Caremark.

Primrose takes this position because there are consequences that follow from ABDC paying the charge through Central Payment.  Once ABDC paid Caremark, Primrose would then owe the debt to ABDC, which would risk triggering the 18% interest and litigation costs provisions found in the MPA and the Credit Agreement, and further triggering the guaranties executed by Defendants Blass-Schutz, Bucholz, and Althea Group, with ABDC.  There were no similar penalties or sureties in the agreements between Primrose and Caremark.

C. The Procedural Posture

This case was originally filed five years ago in the Pennsylvania Court of Common Pleas and removed to this Court pursuant to this Court's diversity jurisdiction under 28 U.S.C. § 1331. This litigation has been long and contentious, with a special master appointed to address repeated discovery disputes.  That same master, at the parties' request, attempted to facilitate a settlement. The action was then stayed pending completion of the arbitration between Primrose and Caremark.[3]   These proceedings resumed after Primrose belatedly informed ABDC of the

---

[3] The arbitration largely addressed whether Caremark violated its agreement with Primrose by charging Primrose, through ABDC, for the audit *after* terminating Primrose from the Caremark network.  The arbitrator's award is in the record at ECF 106, Ex. G.  While the arbitrator ruled for Primrose on the breach, it denied Primrose the lion's share of the damages sought.  (The arbitrator made "no findings as to the propriety of any collection methods of ABDC or any possible breach of any agreement by ABDC.") The arbitrator found that the consequential damages and attorneys' fees claims made by Primrose (including to indemnify the interest and fees at issue in the present litigation) were unproven, speculative, and unavailable under their agreements, and that awarding the $1,347,661.17 value of the disputed charge would be a windfall to Primrose.  The arbitrator did award $116,421.88 to Primrose which represents the delay for the interest on the $1,737,640.55 difference between the original and corrected audit recovery charge, which Caremark only returned to ABDC over four months after the initial charge.  *Id.*  That value appears to be calculated at 18% APR assessed daily as per Primrose's agreements with ABDC.  ABDC states that Primrose has not conveyed this money to ABDC.  Pl. Br. at 9.

conclusion of that arbitration earlier this year.  Plaintiff ABDC now moves for partial summary

judgment as to Counts I, III, and IV of its Complaint: breach of duty to pay unpaid balances; breach

of individual guaranties; and breach of the Alethea guaranty.[4]

## II.    Standard of Review

The parties' motions for summary judgment are governed by the well-established standard

for summary judgment set forth in Fed. R. Civ. P. 56(a), as amplified by *Celotex Corp. v. Catrett*,

477 U.S. 317, 322–23 (1986).  "Where the record taken as a whole could not lead a rational trier

of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec.*

*Indus. Co., Ltd.  v. Zenith Radio Corp.*, 475 U.S.  574, 587 (1986).

---

Both parties refer to the arbitration award to support various legal conclusions in their briefs.  However, collateral estoppel does not apply to the arbitrator award with regard to these proceedings.  Although "[u]nder Pennsylvania law, arbitration proceedings and their findings are considered final judgments for the purposes of collateral estoppel," the four requirements of collateral estoppel must still be met including: (1) identical issues; (2) a final judgment on the merits as to those issues; (3) the party against whom estoppel is asserted must be the party or privity with party to the arbitration, and (4) the party against whom estoppel is asserted must have had opportunity to litigate the issue. *Witkowski v. Welch*, 173 F.3d 192, 199 (3d Cir. 1999).

Defendants argue that the Court should recognize the arbitrator's finding that Caremark breached its agreement with Primrose by making the charge *after* terminating Primrose from the Caremark network. ABDC, however, was not a party to the arbitration nor was it in privity with Caremark with regards to the issues raised in the arbitration.  *See, e.g., Robinson v. Fye*, 192 A.3d 1225, 1234 (Pa. Commw. 2018) ("Overall, privity between parties lies when there exists mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right.").  Therefore, the legal determination of the arbitrator cannot be held against ABDC.  Nevertheless, for purposes of this summary judgment motion, I recognize it as a disputed material fact, just not one that gives rise to a genuine dispute that impairs ABDC's right to judgment as a matter of law for the reasons discussed below.

Plaintiff ABDC does not explicitly ground any of its legal arguments in the arbitration, but, in the factual background section of its brief, ABDC points out that the interest award made to Primrose required that Primrose concede that the interest provisions of the agreements between ABDC and Primrose were binding. Pl. Br. at 8-9, ECF 106.  Even if ABDC were to substantively argue this point in favor of their position that the interest provision is enforceable, the factual record at present is too sparse to address whether the first two prongs of the requirements for collateral estoppel would apply here.

[4] Defendants separately filed an objection under FRE 106 as to the admissibility of an exhibit relied upon by Plaintiff for completeness.

### III.  **Discussion**

The pending motion principally turns on reading the contracts at issue and finding that they entitle the movant to judgment as a matter of law.  As such, it is important to preface the discussion with the basic principles and standards of review as to the law of contracts in Pennsylvania.[5]  To the extent the contractual language is unambiguous, I can interpret it as a matter of law.  *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004).  A factual issue is raised where a contract is ambiguous and susceptible to different constructions.  *Id.*  When interpreting the contract, "the entire contract should be read as a whole, our interpretation must seek to give effect to all of its provisions, and we will not interpret one provision of a contract in a manner which results in another portion being annulled."  *Commonwealth by Shapiro v. UPMC*, 208 A.3d 898, 911 (Pa. 2019) (cleaned up).  Furthermore, "[w]here several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other; and this is so although the

---

[5] In their brief, Defendants argue that Arizona law of agency applies to the breach, alleged by Primrose, of ABDC's duty of loyalty created by ABDC's appointment as Primrose's "attorney-in-fact."  The Administrator Agreement, between Caremark and ABDC, includes an Arizona choice-of-law provision. ECF 109-4, ¶ 10(d).  The Provider Agreement, between Caremark and Primrose, also includes an Arizona choice-of-law provision. ECF 109-6, ¶ 13.  And the Agency Addendum, between Caremark and Primrose, is noted as an addendum to the Provider Agreement, suggesting that it would also be governed by the Arizona choice-of-law clause. ECF 109-5, ¶ B. Thus, although the parties in this litigation are not both signatories to any of these agreements, Arizona law, as discussed further below, may be relevant to determining the scope of the ABDC's designation as "attorney-in-fact."

However, all the agreements entered into directly between Defendants, including Primrose and its principals, and Plaintiff ABDC are governed by Pennsylvania choice-of-law clauses.  These agreements include the Credit Agreement (ECF 111-1, at 4 ¶ 9), Personal Guaranty (ECF 111-1, at 6), the MPA (ECF 106, Ex. D, at Ex. C ¶ 8.6), and the Elevate Term Sheet (incorporating the MPA at 106, Ex. D ¶ 5).  These are the documents that ABDC claims give rise to its rights and Primrose's breaches in this litigation.  The fact that Primrose raises a defense that may be better resolved under Arizona law does not disturb the general application of Pennsylvania contract law to the greater substance of the dispute.  *See* Restatement (Second) of Conflicts of Laws § 187(1) (defining application of choice-of-law clauses as to "particular issue[s]"); *see also Pennsylvania Dept. of Banking v. NCAS of Delaware, LLC*, 948 A.2d 752, 757-58 (Pa. 2008) (adopting § 187).

instruments may have been executed at different times and do not in terms refer to each other."

*Huegel v. Mifflin Const. Co., Inc.,* 796 A.2d 350, 354–355 (Pa. Super. 2002).[6]

A.   Primrose Owes ABDC the Underlying Debt at Issue

The keystone determination that must be made is whether Primrose owes ABDC for the charges paid by ABDC to Caremark on behalf of Primrose as part of an audit recovery by Caremark.   Primrose has not reimbursed ABDC for such payments despite the indemnification clauses in the agreements between them.   Defendants raise two related defenses: first, that Caremark's alleged breach in making the charge against Primrose through Central Payment *after* terminating it from the Caremark network stripped ABDC of the authority to process the charge; and second, that ABDC had a fiduciary duty to Primrose that it breached when it processed the charge, nullifying Primrose's duty to indemnify.   These defenses lack merit.   There is no genuine issue of material fact and ABDC is entitled to a judgment as a matter of law that it acted pursuant to its expressly delegated authority as Primrose's agent when it made the audit recovery charge payment to Caremark through Central Payment.   It did not breach any duty it had to Primrose or otherwise exceed its authority under the agreements, and therefore ABDC is entitled to indemnification for the outstanding monies owed as a result of the charge.

1.   The Agreements Granted ABDC the Authority to Process the Audit Recovery Charge

As an initial matter, I conclude that the agreements among Primrose, ABDC, and Caremark, as excerpted above, expressly set forth ABDC's authority as an agent for Primrose to manage Primrose's balance with Caremark by processing both payments and offsets using the

---

[6] The parties appear to agree that the contracts at issue are valid and binding and that, should breach be found as to the nonpayment, ABDC has been injured.  The controlling issue is whether Primrose's failure to reimburse ABDC for the payment made to Caremark on its behalf constitutes a breach of the respective agreements at issue.  *See Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016) (reiterating elements of breach of contract in Pennsylvania).

aggregated Central Payment mechanism: "[Primrose] hereby appoints [ABDC] as its agent to receive all payments that Caremark may make … Caremark may offset against all or any portion of a Central Payment amounts owed to Caremark by any provider (and not limited to the undersigned [Primrose]) affiliated with [ABDC] in a Central Payment arrangement, including without limitation, amounts owed as a result of audit recoveries … ." Agency Addendum, ECF 109-5, ¶ 1(a).[7]  This delegation of agency power is reinforced in the Elevate Provider Network Term Sheet.  ECF  106, Ex. D, ¶ 4(h) ("Customer authorizes ABDC to receive payment and EOBs from Payors for each Pharmacy and make deposits to Customer's account and initiate adjustments for entries made in error as determined by ABDC or a Payor through a Customer audit.").

The burden now shifts to Primrose to show either that there are material facts that raise a genuine dispute or that ABDC is not entitled to judgment as a matter of law as to ABDC's authority to process the charge at issue, despite the plain language of the agreements.

2. The Circumstances Do Not Give Rise to a Reasonable Inference That ABDC's Authority to Process the Charge at Issue Was Terminated

Primrose's first argument is that Caremark was prohibited by the terms of the Administrator Agreement from using the Central Payment mechanism to apply a negative open balance *after* Caremark terminated Primrose from the Caremark Network.  Def. Br. at 13-15.[8]

---

[7] As quoted, the offset power of Caremark, to which Primrose agreed, operated against the entire Central Payment balance and not just the individual provider's balance.  *See* Administrator Agreement, ECF 109-4, ¶ 1(a) ("Caremark may offset *against all or any portion of a Central Payment* amounts owed by a Participating Provider to Caremark…").  This right enabled Caremark to charge the whole balance owed by Primrose through Central Payment in a single transaction, i.e. the charge at issue, instead of being limited to the remedy of withholding payment on scores of Primrose's individual benefits claims worth only hundreds or thousands of dollars a piece to recoup a sum in the millions.

[8] There is a genuine dispute as to whether Caremark did in fact terminate Primrose from the network before or after the audit recovery charge was made through Central Payment.  This dispute hangs on whether "termination" refers to termination from the PSAO affiliation in Central Payment or termination from the Caremark Network.  *See* Final Corrected Award, ECF 106, Ex. G (discussing the dispute).  Although the arbitrator ruled in favor of Primrose on this point, as noted above, this determination cannot be held against

Defendants imply that this alleged breach by Caremark made the charge itself unauthorized and therefore stripped ABDC from the authority to pay it on behalf of Primrose.   However, even assuming that Caremark violated the Administrator Agreement by making the charge after terminating Primrose from the network, it does not follow that this alleged breach stripped ABDC of its general authority to pay such a charge on behalf of Primrose.   The Restatement (Second) of Agency § 108 states that such previously granted authority would only have been terminated or suspended "when the agent has notice of the happening of an event or of a change in circumstances from which [they] should reasonably infer that the principal does not consent to the further exercise of authority or would not consent if [they] knew the facts."[9]   Here a rational reading of the record supports neither a finding that ABDC had notice of the termination, nor that, even if ABDC had such notice, it should have reasonably inferred the termination of its authority to process the charge.

First, there are no facts in the record to indicate that ABDC had notice of Caremark's decision to terminate Primrose prior to processing the charge.   Defendants have included in the record a number of documents sent by and to Caremark employees discussing the termination of

---

ABDC for the purposes of this litigation.   Regardless, construing all factual disputes in favor of the non-movant, I conclude that the relevance of this dispute to the present action is limited to whether ABDC should have reasonably inferred from Primrose's termination from the Caremark network that ABDC no longer had the authority to process payments and charges from Caremark to Primrose through Central Payment for liabilities incurred prior to the termination.

[9] Although it does not appear that any courts in Pennsylvania have applied § 108 specifically, Pennsylvania courts generally follow the Second Restatement of Agency.   *See Basile v. H & R Block, Inc.*, 761 A.2d 1115, 1120 (Pa. 2000).   Courts in Arizona, which Defendants argue governs the fiduciary scope of the relationship, similarly have not specifically adopted § 108, but they too apply the Second Restatement of Agency.   *See In re Sky Harbor Hotel Properties, LLC*, 443 P.3d 21, 23 (Ariz. 2019) ("Absent controlling authority to the contrary, we generally follow the Restatement when it sets forth sound legal policy.") (applying the Restatement (Second) of Agency).   The Third Restatement is not substantially different on this point of law.   Restatement (Third) of Agency § 3.09 ("An agent's actual authority terminates … upon the occurrence of circumstances on the basis of which the agent should reasonably conclude that the principal no longer would assent to the agent's taking action on the principal's behalf.").

Primrose, but there is no evidence that any of these documents were sent to ABDC.  *See* ECF 109-8 (letter from Caremark to Primrose of Oct. 10, 2016); 109-9 (internal Caremark email thread of Nov. 3, 2016); 109-10 (email thread between Primrose and Caremark of Nov. 9, 2016); 109-12 (internal Caremark email thread of Nov. 23, 2016).[10]   Primrose's core defense, that "ABDC knowingly facilitated this breach of contract," Def. Br. at 7, is therefore unsupported by any facts in the record that show ABDC knew or even should have known that Caremark had terminated Primrose from the Caremark network prior to the charge.  I therefore find that Primrose has failed to bring forth evidence raising a genuine factual dispute as to this defense.  *See Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990) ("unsupported allegations in [nonmovant's] memorandum and pleadings are insufficient to repel summary judgment.").

Even if Defendants could point to evidence that ABDC had notice of Caremark's termination of Primrose from the Caremark network prior to the charge, I further conclude that Defendants' argument based on abrogation of authority fails because the facts in the record show that no rational trier of fact would be able find that it would have been reasonable for ABDC to infer that Primrose no longer consented to ABDC's authority to accept charges through Central Payment.  Specifically, looking at the conduct of the parties in light of the terms of the contracts at issue, I find that it would not be reasonable for ABDC to have inferred the abrogation of its processing authority based on four independent, although related, reasons: (1) Primrose never acted to revoke the previously granted authority, (2) ABDC did not have the authority to unilaterally stop accepting charges through Central Pay against Primrose, (3) a unilateral decision

---

[10] There is evidence in the record that ABDC was aware of the audit results and the impending charge related to the audit well prior to the termination, including the fact that the present action was filed before the charge was processed.  But this is distinct from Caremark's internal deliberations related to Caremark's decision to terminate Primrose from their services for processing new prescription claims.

not to accept the charge at issue would have inserted ABDC into a dispute between Caremark and Primrose which had been foreclosed by the contracts which Primrose had agreed to, and (4) the termination provision that Primrose cites as raising a duty in Caremark's part cannot be reasonably imputed to ABDC.

First, Primrose had notice of the forthcoming charge related to the audit for an extended period of time yet took no actions to revoke ABDC's authority to pay it. According to the record, Primrose was made aware that Caremark believed it was entitled to recover approximately $3 million following an audit around July 28, 2016. Blass-Schutz Testimony 116:18 – 117:12, ECF 106, Ex. A. Caremark issued Primrose a "Final Discrepancy Letter" on October 20, 2016. ECF 109-13. ABDC was aware of this impending charge and acted, even before the charge was finally made, to protect itself by filing the present lawsuit in the Pennsylvania Court of Common Pleas on October 26, 2016, seeking to enjoin Primrose to provide collateral as security for the anticipated charge. ECF 1, Ex. A ¶ 89. The disputed charge through Central Payment was not made until the end of November 2016. Blass-Schutz Test. 124:20-125:1; *see also* Statement, ECF 106, Ex. F. There is no evidence to suggest that, between the issuance of the Final Discrepancy Letter at the end of October and the charge at the end of November, Primrose ever formally requested that ABDC cease processing Caremark payments or charges through Central Payment. Indeed, in all that time Primrose failed to avail itself of ¶ 3 of the Agency Addendum, entitled "Termination of Appointment of Attorney-in-Fact," which provided a set mechanism for revoking ABDC's authority to process payments and charges from Caremark with fifteen days prior written notice.[11] Primrose's failure to issue formal notice to ABDC to terminate the agency relationship is

---

[11] Primrose may also have availed itself of ¶ 1 of the Master Program Agreement which permitted Primrose to cancel either all ABDC's PSAO services or those just related to the Elevate Network with sixty days prior written notice.

unsurprising given its other course of conduct; even after Primrose had been formally terminated from the Caremark network on October 21, 2016, ECF 109-8, it was—as late as November 9, 2016—trying to gain readmission which would have required its continued authorization and use of the Central Payment system, ECF 109-10.  Thus not only is there no evidence in the record that Primrose expressed an intent to terminate ABDC's authority to process the charge, but Primrose actually engaged in a course of conduct that a reasonable party would have inferred to indicate consent to remain in the PSAO network and the access it provided to Caremark's services.

A second and related point is that even if Primrose wanted to revoke ABDC's authority to pay the charge at issue, the constellation of agreements read as a whole foreclose the possibility of Primrose unilaterally changing the payment terms with a payor such as Caremark for already incurred liabilities.  This is logical given the purpose of a PSAO network like Elevate.  Caremark contracts with such networks because they offer the opportunity for Caremark to sell services to small, independent pharmacies without the high administration costs and non-payment risks that would be incumbent upon contracting with a plethora of such pharmacies individually.  Thus, it makes sense that the agreements are written so as to require an independent pharmacy seeking to participate in the network to agree to the PSAO acting as the exclusive mechanism for managing payments with Caremark, without the option of electing to personally handle discrete transactions at their own convenience.  This logic undergirds the Agency Addendum which provides that "Provider acknowledges that, while this Addendum is in effect, (i) Administrator shall have the sole authority to enroll or disenroll Provider in a Caremark Network and (ii) Provider's enrollment or nonenrollment in a Caremark Network is subject to the terms of the Administrator Agreement." ECF 109-5, ¶ 1.  Not surprisingly, the other key provision of this document is an express authorization for ABDC to act as Primrose's agent in processing payments as well as potential

audit recoveries through Central Payment.  *Id.* ¶ 1(a).  The Agency Addendum was subordinate to the Administrator Agreement between ABDC and Caremark, consented to by Primrose, where ABDC warrants its control over enrollment/disenrollment of Primrose in the network and its capacity to process all payments and charges between Caremark and Primrose through Central Payment.  ECF 109-4, ¶¶ 1, 1(a).  Read together, these documents delegate to ABDC (and relinquish from Primrose) the power to enroll Primrose in the Caremark network, on the condition that it utilize the Central Payment mechanism, and likewise disenroll it subject to its power to reconcile balances between Caremark and Primrose through Central Payment.  Primrose could have directed ABDC to disenroll it from the Caremark Network (and thus forego future access to Caremark's services) pursuant to the Provider Manual, ECF 109-7 at 34 (termination without cause provision), but it did not under these terms reserve the power to unilaterally change the terms of payment as to obligations and liabilities that it had already accrued in the past, for which the use of Central Payment was authorized.  In fact, termination without cause under the Provider Manual would only take effect thirty days after notice, providing Caremark with the opportunity to square up any pending payments or charges.[12]  *Id.*  Thus, even assuming Primrose's desire to revoke ABDC's authority to accept a charge from Caremark through Central Payment, the agreements

---

[12] The termination provision of the Agency Addendum, by which Primrose may have terminated ABDC's capacity to act as its agent with respect to the Caremark Network but hypothetically preserved its participation in the network itself albeit with a different payment agent, also required fifteen days prior notice before going into effect.  Agency Addendum ¶ 3. The Master Program Agreement, under which Primrose may have terminated its participation in ABDC's PSAO services generally or the Elevate Network specifically, required sixty days prior notice for termination without cause.  MPA ¶ 1.

The Elevate Term Sheet also provided that, in the event of termination under the MPA's provision, ABDC was authorized to "retain any amounts necessary to satisfy Customer's obligations to ABDC," establish a security deposit in anticipation of anticipated post-termination adjustments and retain any outstanding payments to reduce any "reasonably anticipated or then outstanding liabilities to ABDC or to a Payor." Elevate Term Sheet ¶ 9(d).  Thus, even had Primrose availed itself of the available termination provisions, ABDC would have retained the right to charge Primrose for the anticipated audit recovery charge owed to Caremark.

did not confer any right on Primrose to demand such revocation to its benefit and at the expense of Caremark.

Third and further related to the scope of ABDC's authority under the agreements, two distinct provisions of the Elevate Term Sheet unambiguously made clear that ABDC would take no part in any disputes between Primrose and Caremark.  It states at the outset that "[f]ees are not sufficient, nor does this Program have resources, to resolve reimbursement, payment, audit and other disputes arising among Customer and Payors…" ECF 106, Ex. D, ¶ 3(c).  Rather, it placed responsibility with Primrose: "Customer is solely responsible for its relationships with Payors, including responding to, defending and resolving such disputes … and paying any amounts owed as a result of a dispute." *Id.* ¶ 4(b).  ABDC's own agreement with Caremark, which was fully disclosed to Primrose, warranted that ABDC had the capacity to accept both payments and chargebacks through Central Payment on behalf of Primrose.  Administrator Agreement, ECF 109-4, ¶ 1(a).  Any refusal by ABDC to accept the charge against Primrose through Central Payment would have risked a breach with Caremark, a risk known by Primrose.  These contractual limits assented to by Primrose as part of the overall agreement, coupled with ABDC's disclaimer of any involvement in disputes between Caremark and Primrose, and with ABDC's warranty to Caremark of its capacity to process charges, placed contractual constraints on what might have been reasonably expected of ABDC in inferring the termination of its authority to process the charges.  Thus, it would have been unreasonable for ABDC to infer the termination of its authority when the specific nature of that termination would function as an affirmative intervention in the dispute between Caremark and Primrose, which had been expressly disclaimed in the agreements among the parties and which Primrose knew could constitute a breach between ABDC and Caremark.  *See*

*also* Restatement (Second) of Agency § 385 (1958) ("Unless he is privileged to protect his own or another's interests, an agent is subject to a duty [to obey].").

Fourth and finally, Caremark's purported failure to abide by its obligations under the termination provision cannot be imputed to ABDC.  The contractual provision on which Primrose relies makes no mention of ABDC, stating that "Caremark will not apply against the Central Payment a negative Pharmacy Open Balance associated with a Participating Provider after such Participating Provider ceases its operations or is terminated by Caremark." Administrator Agreement, ECF 109-4, ¶ 1(a).  To find it reasonable that this provision acted to terminate or limit ABDC's authority to process the charge thus requires (1) the imputation of Caremark's duty to ABDC; and (2) that ABDC had notice that Caremark had "terminated" Primrose in the sense required by the agreement.  The contract unambiguously and expressly assigns the promise to not use the Central Payment mechanism post-Caremark Network termination to Caremark, such a duty cannot be imputed to ABDC.  *See* Restatement (Second) of Contracts § 288 cmt. a (1981) ("Where there are more promisors than one in a contract … each promisor may promise a separate performance …").  Second, besides the lack of actual notice regarding purported termination, Caremark and Primrose dispute whether termination occurred.  That in turn would make any notice of termination ambiguous at best.  *See* Final Corrected Award, ECF 106, Ex. G ("That section is not a model of clarity…").[13]

_____

[13] The full quote by the arbitrator which describes the competing interpretations of the provision at issue is as follows:

> Caremark asserts that the word "termination" in Administrator Agreement section 1(a) "means termination of a pharmacy's affiliation with the PSAO in Caremark's system for Central Pay, rather than termination from Caremark's Network." That section is not a model of clarity, and while the argument by Caremark has some plausibility, Primrose has met its burden of proof that the word 'termination' there did refer to *termination from the Caremark Network*.

In summary, the promises between ABDC and Primrose were well-defined and foreclose any finding that ABDC may have reasonably inferred the termination of its authority to process the charge at issue.

3.  ABDC Did Not Owe Primrose Any Duties in Excess of Those Agreed to in the Agreements Among the Parties

Primrose next raises what is best described as a magic words defense, seizing upon language in the Agency Addendum referring to ABDC as Primrose's "attorney-in-fact" to contend that ABDC owed it a fiduciary duty which it violated by processing Caremark's charge.  But this is simply not the case.  To get to the conclusion it seeks, Primrose must ignore what follows the appointing language: "Provider hereby appoints and designates Administrator as its attorney-in-fact to perform *those functions set forth in the Administrator Agreement,* including …"  ECF 109-5 ¶ 1 (emphasis added).  This limitation matters.  Under well-established principles of agency law, an agent is a fiduciary *only* with respect to matters within the scope of the agency.  *See* Restatement (Second) of Agency § 13 (1958); *see also In re Sky Harbor Hotel Properties, LLC*, 443 P.3d 21, 23 (Ariz. 2019) ("Importantly, '[a]n agent is a fiduciary with respect to matters within the scope of his agency.'") (quoting Restatement (Second) of Agency § 13); *Lerner v. DMB Realty, LLC*, 322 P.3d 909, 920 (Ariz. App. 1st Div. 2014) ("agent's fiduciary duties to the principal vary depending on the parties' agreement and the scope of the parties' relationship") (quoting Restatement (Third) of Agency § 8.01 cmt. c).[14]

---

ECF 106, Ex. G (emphasis in original).  As discussed above, the arbitrator's finding on this point cannot be collaterally estopped against ABDC.

[14] As noted above, Primrose asserts that Arizona law applies to the fiduciary duty defense because the Administrator Agreement, which originally defines the attorney-in-fact role, has a choice-of-law provision in favor of Arizona, ECF 109-4 ¶ 10(d), and the Agency Addendum was entered into as addendum to that agreement, ECF 109-5 ¶ C.   Neither party briefs how the parties' choice of Pennsylvania law under the MPA, Ex. C ¶ 8.6 (incorporated into the Elevate Term Sheet pursuant to MPA ¶ 5), impacts the legal standard of determining the scope of the agency relationship in light of the Arizona choice-of-law provision

The scope of that agency relationship is determined by the terms of the agreements between the parties.  *Id.* § 376.  Here, the Agency Addendum provides ABDC with authority to enroll and disenroll Primrose in Caremark's networks, to receive notices from Caremark about those networks, to enter into amendments to the Provider Agreement on Primrose's behalf, and, most importantly, to process payments and offsets through Central Payment on Primrose's behalf.  ECF 109-5 ¶¶ 1, 1(a).  The Master Program Agreement and the Elevate Term Sheet are also relevant to the scope and limits of ABDC's duties, as they govern the terms under which Primrose contracted with ABDC to provide access to the Caremark network as well as any other insurance network.  ECF 106, Exs. C, D.[15]  In the MPA, ABDC agrees to provide programs such as the Elevate network, ECF 106, Ex. C ¶ 1.0, and expressly disclaims any "fiduciary or other special relationship" on the basis of the contract, *id.* Ex. C ¶ 8.5.  In the Elevate Term Sheet, ABDC agrees to enter and negotiate contracts with insurance payors such as Caremark, ¶ 3(a), provide some claims assistance, *id.* ¶ 3(b), promote the network to payors, *id.* ¶ 3(d), and manage the Central Payment system on behalf of customers, *id.* ¶¶ 3(e)-(g).  ECF 106, Ex. D.  The Elevate Term Sheet also incorporates ¶ 8.5 of the MPA and reiterates that "Customer, ABDC and each Payor are

---

in the Administrator Agreement, or the fact that the parties are not together signatories to either the Administrator Agreement or the Agency Addendum.  Nevertheless, the Arizona courts provide no more support to Defendants' position than do the Pennsylvania courts or the Restatement alone.  The Arizona Supreme Court has "long followed the rule that where not bound by [its] previous decisions or by legislative enactment, [follows] the Restatement of the Law."  *In re Krohn*, 52 P.3d 774, 779 (Ariz. 2002) (en banc); *see In re Sky Harbor Hotel Properties, LLC*, 443 P.3d 21, 23 (Ariz. 2019) (restating this principle and relying on the Second Restatement of Agency).

The various Restatements, the Arizona courts, and the Pennsylvania courts all agree on the legal points at issue in this section—that an agency relationship is only fiduciary with respect to its express scope, that specific authorizations weigh against an inference of general authority, and that an intermediary with duties to both parties does not violate the duty of loyalty to one when it carries out its contractual responsibilities agreed to by both—and I will therefore cite all three when available.

[15] Defendants acknowledge that "the MPA and Term Sheet must be read in conjunction with ABDC's duty to act as Primrose's attorney-in-fact consistent with the Agency Addendum, as both agreements relate to ABDC's PSAO function."  Def. Br. at 16-17, ECF 109.

independent contractors." *Id.* ¶ 8(a).  And, even more pertinently, as noted above, the term sheet twice expressly disclaims any role for ABDC in disputes between Primrose and Caremark.  *Id.* ¶ 3(c) ("Fees are not sufficient, nor does this Program have resources, to resolve reimbursement, payment, audit and other disputes arising among Customer and Payors…"); *id.* ¶ 4(b) ("Customer is solely responsible for its relationships with Payors, including responding to, defending and resolving such disputes … and paying any amounts owed as a result of a dispute.").[16]

These provisions set both the breadth and the limits of ABDC's duties to Primrose under the agreements.  They do not support Defendants' contention of an expansive, "general" agency relationship, but instead one of delimited duties related to network enrollment and payment processing within those networks.  "The specific authorization of particular acts tends to show that a more general authority is not intended."  Restatement (Second) of Agency § 37; *see also Zidek v. Forbes Nat. Bank,* 48 A.2d 103, 445 (Pa. Super. 1946) ("Unless otherwise agreed, general expressions in authorizing an agent are limited in application to acts done in connection with the act or business to which the authority primarily relates; and the specific authorization of particular acts tends to show that a more general authority is not intended.") (citing § 37).  To the extent that ABDC's authority to accept payments without looking behind transactions had the potential to favor its interests over those of Primrose, ABDC's own interests and its right to protect them was patent in the documents.

Moreover, when an agent is acting as an intermediary between a buyer and seller, there is no conflict where the relationship has been clearly defined. "With the clients' informed consent

---

[16] Primrose points out ABDC's communications with Caremark about the audit as evidence of ABDC's malfeasance and alleged violation of the duty of loyalty.  Def. Br. at 17.  However, these communications were expressly authorized under one of the dispute resolution provisions of the Elevate Term Sheet.  ECF 106, Ex. D ¶ 3(c) ("Customer authorizes ABDC to provide information related to such disputes to Payors, including invoices from ABDC's records and supporting material provided by Customer, and to receive information and documents related to disputes from Payors.").

and in the absence of fraud ... the duties a broker owes the clients may be limited by contract." *Lerner v. DMB Realty, LLC*, 322 P.3d 909, 920 (Ariz. App. 1st Div. 2014) (citing Restatement (Third) of Agency § 8.01 cmt. c; Restatement (Second) of Agency § 376); *see also Claughton v. Bear Stearns & Co.,* 397 Pa. 480, 491 (1959) ("The rule that an agent cannot act for both parties to a transaction has no application where such double representation was known to the parties and not objected to by them at or previous to the time when they executed their agreement…."); Restatement (Second) of Agency §§ 390, 392.  The actions taken by ABCD here fall within the express authority of the agreements, which did not give rise to the additional duties Primrose now asserts.

4.  <u>Primrose Has Breached Its Agreement to Indemnify ABDC for the Charges at Issue</u>

Having shown that ABDC had authority to pay the charge at issue, I conclude as well that Primrose agreed to indemnify ABDC for the charges paid as a result of the offset by Caremark. The Elevate Term Sheet includes an indemnification clause that expressly indemnifies "any offset taken by a Payor for a Claim against Customer" as is the case here.  ¶ 4(b).  Defendants admitted at the arbitration that Primrose agreed to this term.  Blass-Schutz Testimony 144:5-14, ECF 106, Ex. A.

Therefore, based on the plain language of the contracts at issue, ABDC has met its burden as the moving party to have the right to process the charges at issue and to seek indemnification from Primrose to recoup those charges.  On the undisputed facts of record, Defendant Primrose owes to ABDC the balance of the audit recoveries paid to Caremark.

B.  <u>The Application of the Master Program Agreement to the Debt</u>

Having established that ABDC is entitled to the value of the charges that it paid on behalf of Primrose to Caremark for the audit recovery, the next question is whether ABDC is entitled to contractual interest and litigation costs.  ABDC argues that two different agreements provide

interest and costs: the MPA and the Credit Agreement.  Defendants argue that neither of these two agreements should apply to the outstanding obligations at issue here.  I will first address the MPA, analyzing the interest and the litigation costs provisions respectively, and then address the application of the Credit Agreement separately.  I conclude that both agreements are enforceable as to the interest and litigation costs provisions.

1.  The Interest Provision under the MPA

The interest provision of the MPA, included under the "Duties of Customer" heading of Exhibit C to the MPA, applies to "Available Programs payments."  MPA, Ex. C ¶ 2.2.  It provides: "Payments.  Available Program payments must be received by ABDC on the date due.  If the payment is delinquent, ABDC may … assess a per-day late payment fee of the lower of 0.05% (18%/360) or the maximum rate permitted by law on the outstanding balance until paid … ." *Id.* The question is whether "Available Program payments" include offset charges made by Caremark against Primrose's Central Payment account. I construe the sections defining "Payment" and "Fees" in the MPA as written broadly enough to ensure that the charges at issue here should be apprehended as "Available Program payments" subject to interest charges in Ex. C ¶ 2.2.

The "Payment" provision is found in MPA ¶ 4(c) under the heading Customer Commitments: "**Payment**.  Unless otherwise agreed, ABDC will bill fees monthly and add to the billed amount applicable sales, use or other tax or charges, with payment due under terms of Customer's prime vendor agreement." *Id.* ¶ 4(c).  The MPA defines "Fees" in the following way: "**FEES.**  Each Term Sheet states applicable per-Pharmacy fees.  Some Available Programs require Customer to incur other expenses, which are Customer's responsibility." ¶ 2.[17]  Defendants argue that "Available Program payments" in ¶ 2.2 of Ex. C to the MPA are limited to the "monthly

---

[17] The Elevate Term Sheet includes a schedule of monthly fees related to participation in the network. ¶ 2.

program fees" set forth in ¶ 4(c), i.e. flat monthly service charges listed in a schedule in the Elevate Term Sheet at ¶ 2.  Def. Br. at 19 n.10, ECF 109.  However, "the entire contract should be read as a whole, our interpretation must seek to give effect to all of its provisions, and we will not interpret one provision of a contract in a manner which results in another portion being annulled." *Commonwealth by Shapiro v. UPMC*, 208 A.3d 898, 911 (Pa. 2019) (cleaned up).  The language of "fees" or "other … charges" in ¶ 4(c) is on its own broad enough to encompass the offset charges asserted by Caremark.  But combined with the "Fees" provision's recognition of other expenses incurred specifically through "Available Programs," it is evident that the "Available Programs payments" of Ex. C ¶ 2.2 should be read to include Primrose's enrollment in the Caremark Network and its Central Payment mechanism, through which Caremark submitted its charge.

The applicability of an 18% interest rate is reinforced by ¶ 1 of the Credit Agreement, which on its face applies to "all purchases of goods and services" unless otherwise specified."  As previously noted, "[w]here several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other; and this is so although the instruments may have been executed at different times and do not in terms refer to each other." *Huegel v. Mifflin Const. Co., Inc.,* 796 A.2d 350, 354–355 (Pa. Super. 2002).  The fact that both the MPA and the Credit Agreement include broadly applicable interest provisions to debts incurred by Primrose to ABDC for services provided by ABDC reinforces that the parties understood and intended ABDC to be able to enforce the interest provisions for audit recovery charges such as the one at issue in the present litigation.[18]

---

[18] There is also a provision in the Elevate Term Sheet which discusses these other expenses and ABDC's remedies to recoup them:

> Customer is solely responsible for its relationships with Payors … and paying any amounts owed as a result of a dispute.  Customer agrees to reimburse and indemnifies ABDC for

2.   The Litigation Costs Provisions under the MPA and the Elevate Term Sheet

Both the MPA and the Elevate Term Sheet include litigation costs and fees provisions that I conclude are applicable here.  First, the MPA provides that "[t]he successful party in any legal action may recover all costs it incurs, including reasonable attorneys' fees." Ex. C ¶ 8.6.  Similarly, the Elevate Term Sheet states that "ABDC may take any lawful actions under this or other agreements between ABDC and Customer to recovery any amount owed by customer to ABDC including recovery of interest, costs and reasonable attorney's fees."  ¶ 4(d).  Because I found above that Primrose breached its indemnification agreement with ABDC and owes ABDC the core underlying debt, ABDC is the "successful party" to this action as to Primrose, and the litigation costs and fees are recoverable against Primrose.

C.   The Credit Agreement and Personal Guaranty

I also conclude that the Credit Agreement and Personal Guaranty are enforceable against the Defendants.  To do so, I must address the agreements themselves, analyze their place in the complete universe of agreements in play, and decide whether an affidavit by Defendant Blass-Schutz establishes a material issue of fact as to the scope of the Credit Agreement and Personal Guaranty.

---

any offset taken by a Payor for a Claim against Customer and ABDC may reduce or delay other payments to Customer … if anticipated offsets or adjustments may create a negative balance.  ABDC may take any lawful actions under this or other agreements between ABDC and Customer to recovery any amount owed by customer to ABDC including recovery of interest, costs and reasonable attorney's fees.

ECF 106, Ex. D, ¶ 4(d).  This provision recognizes that offset charges are possible, that if taken and paid by ABDC they will be an obligation of Primrose, that ABDC can set off a negative balance with other payments owed to Primrose, and that ABDC can also pursue remedies provided under other agreements such as the MPA in order to recovery those debts.  This language does not limit but instead expands the remedies available under the MPA for payments due for Available Programs and clarifies the types of "other expenses" in the MPA that the Elevate Term Sheet may entail, "any offset taken by a Payor for a Claim against Customer."

Defendants signed the Credit Agreement and Personal Guaranty on January 14, 2013.  ECF 111-1, at 5.  The terms of the Credit Agreement are stated to "apply to all purchases of goods and services unless the Prime Vendor Agreement or other individual service agreement provides otherwise." *Id.* ¶ 1.  The terms allow ABDC to set a due date for monies owed, *id.* ¶ 1(a), and to "assess a per-day late payment fee of the lower of 0.05% (18%/360) or the maximum rate permitted by law on the outstanding balances until paid," *id.* ¶ 1(c).  The Credit Agreement includes a provision for ABDC to obtain a security interest against Primrose's "Obligations."  *Id.* ¶ 2.  "Obligations" are defined as "all of Applicant's existing and future liabilities to ABDC and its affiliates." *Id.*  Efforts to collect on Obligations that involve counsel trigger a costs and fees provision.  *Id.* ¶ 6.

The timing of the agreement is also instructive. The Personal Guaranty was signed contemporaneously with the Credit Agreement.  Significantly, the Personal Guaranty states that it was executed "as an inducement for [ABDC] to extend credit" to Primrose.  ECF 111-1, at 6.  It requires the party signing to "… guarantee … to ABDC … the prompt and full payment … and performance of all Obligations (as defined in the attached Credit Agreement) of Applicant to ABDC, whether now existing or hereafter arising."  Thus, on a plain reading of the document, the Personal Guaranty was signed as an inducement for ABDC to extend credit to Primrose for all "Obligations," which is defined to include "existing and future liabilities to ABDC" that might arise from "all purchases of goods and services."

Three weeks after signing these documents, on February 5, 2013, Defendant Blass-Schutz signed the Master Program Agreement on behalf of Primrose which, in conjunction with the Elevate Term Sheet, enrolled Primrose in the PSAO program that gave rise to the liabilities at issue in this case.  ECF 106, Exs. C, D.

Defendants attempt to conjure a disputed material fact, and so defeat summary judgment, by arguing that at the time Defendants signed the Credit Agreement and Personal Guaranty, those agreements "were executed as part of a separate agreement to secure inventory purchases from an entirely separate segment of ABDC's business, one that acts as a wholesale distributor of drugs and pharmaceutical supplies." Def. Br. at 19.  Put more sharply, Defendants argue that "[t]he possibility that Caremark might assess a chargeback from the Elevate Provider Network Central Payer system in relation to some future, hypothetical audit was not contemplated, or negotiated for, when the Credit Agreement and Personal Guaranty were executed." Def. Br. at 23.  In support of these arguments, Defendants rely on two items in the record.  First, Defendants point to the Credit Agreement and three additional pages that were signed or included at the same time as the Credit Agreement and Personal Guaranty: an EFT Authorization Application, a voided check (for ACH authorization), and a Payment Terms sheet for pharmaceutical product purchases.[19] Second, Defendants point to statements made under oath by Defendant Blass-Schutz, some made during his testimony at the arbitration proceeding and others in his declaration submitted with the summary judgment response.

The thrust of Defendants' arguments on the basis of the contracts themselves is that although the Credit Agreement under a plain reading applies to "all purchases of goods and services unless … [an]other individual service agreement provides otherwise" because there are various provisions that apply specifically to goods, including the addendum stating payment terms for pharmaceutical products purchases, the word "services" should be ignored so that the Credit

---

[19] Defendants have submitted a motion that objects under FRE 106 as to the Credit Agreement and Personal Guaranty attached to Plaintiff's filing on the basis that it did not include these three additional pages. *See* ECF 111.  The addendum demanded by the Defendants was originally included in the record through Plaintiff's First Amended Complaint.  ECF 18, Ex. B.  For purposes of the record, I will nonetheless grant that motion so as to consider ECF 111-1 as an exhibit in Defendants' response.

Agreement is read to be "concerned solely with the purchase of goods." Def. Br. at 20. But this interpretation does violence to a foundational tenet of contraction interpretation: contracts must be read as a whole, and every word and provision should be given effect. *See Commonwealth by Kane v. UPMC*, 129 A.3d 441, 463-64 (Pa. 2015). Defendants cannot simply read "services" and "service agreement" out of the contract to get to their preferred result. "[W]e will not interpret one provision of a contract in a manner which results in another portion being annulled." *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 648 (Pa. 2009). Contracts regularly contain subparts and more specific provisions that are not generally applicable, and the inclusion of such specific provisions does not thereby nullify more general provisions that apply to different factual situations governed by the same agreement. "When a writing is clear and unequivocal, its meaning must be determined by its contents alone." *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A2d. 418, 429 (Pa. 2001). The writing here is unequivocal and the Credit Agreement and Personal Guaranty, by their unambiguous and plainly read language, clearly apply to the purchase of services such as those obtained under the PSAO servicing agreements entered into here.

Defendants' arguments based upon testimony and the affidavit fare no better. In the arbitration testimony, Blass-Schultz states his belief that the credit provided under the agreement "was to cover the time between when drugs would be delivered and the time [when] payment for those drugs would be made, which in our case was less than 24 hours." Blass-Schutz Testimony 98:5-8, ECF 106, Ex. A. In his declaration, Blass-Schutz repeats his understanding that *when they were signed*, the Credit Agreement and Personal Guaranty only applied to the purchase of drugs and pharmaceutical supplies. ECF 109-1, ¶¶ 2-3. He also claims that ABDC's agents confirmed this understanding to him, *id.* ¶ 4, that they would never have signed the Credit Agreement and Guaranty Agreement if the agreements extended beyond pharmaceutical supplies due to the

expansive liabilities that the PSAO services could trigger, *id.* ¶¶ 5-7,[20] and that they weren't intended to cover the PSAO service entered into three weeks later, *id.* ¶¶ 10, 11.

But this focus on the parties' purported mental states during the earlier timeframe when the Credit Agreement and Personal Guaranty were signed is a diversion. The salient point of reference is instead the time the MPA and Elevate Term Sheet were signed, because the Credit Agreement already in effect pertained to "all … future liabilities to ABDC," ¶ 2, that would apply "*unless …* [an]other individual service agreement would provide otherwise," ¶ 1 (emphasis added). Focusing the contractual analysis on the appropriate time frame and the language of the agreements renders moot the factual dispute that Defendants seek to create through the affidavit. In fact, the language of Defendant Blass-Schutz's affidavit is artfully crafted around this distinction. The paragraphs in the affidavit relating to Defendants' understanding at the time of signing the Credit Agreement and Personal Guaranty reiterate the truism that those early agreements do not identify a specific future agreement. Affidavit ¶¶ 2-7, 10-11. The paragraphs in the affidavit regarding the PSAO agreements set forth another truism—that those agreements were entered into after and separately from the prior agreements. *Id.* ¶ 8 ("Primrose did not contract for those services until…"), ¶ 9 ("… were entirely separate from, and bore no relation to …"), ¶ 12 ("… contemplated entirely different services with entirely different risks …"). The affidavit does not address the central point: three weeks prior, as an inducement for ABDC to do business with Primrose, Defendants had signed an agreement governing "all purchases of goods and services" extending to "all … future liabilities to ABDC." Such obligations applied unless expressly excluded by later agreements, and the

---

[20] Defendants' argument regarding the risk of 18% interest rates on past due liabilities strains credibility in light of the MPA which, as discussed above, also includes an 18% interest provision for past due liabilities. However, as discussed below, I am not discounting or dismissing this affidavit for its credibility, as self-serving and otherwise unsupported as it may be, but because the facts it puts into question are not relevant to the legal determination as to the meaning of the contract that is specifically at issue.

affidavit does not address the essential fact that the MPA and the Elevate Term Sheet do *not* expressly carve themselves out of the Credit Agreement and Personal Guaranty.  Blass-Schutz does feebly claim that "[d]uring the negotiations from the PSAO-related agreements, Plaintiff's salespeople never indicated that Plaintiff intended or expected the Credit Agreement and Personal Guaranty to apply to the services provided" under the PSAO agreements." *Id.* ¶ 13.  But Plaintiff's salespeople didn't have to communicate this state of affairs because it had already been established through the Credit Agreement and Personal Guaranty signed three weeks earlier that were well within Defendants' cognizance and possession.  Defendant Blass-Schutz's testimony and affidavit thus fail to put forward such facts that a rational trier of the fact could, in light of the record taken as a whole, find that liabilities incurred under the PSAO agreements fall outside the Credit Agreement's applicability to all future services purchased by Primrose from ABDC.[21]

In summary, the Credit Agreement applying to "all purchases of goods and services" from ABDC and "all … future liabilities to ABDC" was valid and in effect at the time that Primrose entered into the PSAO agreements (the MPA and the Elevate Term Sheet).  Those PSAO agreements did not expressly carve themselves out of the umbrella of the Credit Agreement nor is there any evidence in the record to suggest that the parties understood or intended those agreements to do so.  I therefore conclude that the liabilities incurred by Primrose to ABDC under the PSAO agreements through Caremark charges are "Obligations" under the Credit Agreement for which Primrose is in breach for non-payment upon demand.  The delinquency in their payment by ABDC

---

[21] As a backstop, Defendants argue that even if the Personal Guaranty is found enforceable, it should be limited to Pennsylvania's 6% interest cap in 41 P.S. § 201.  But § 201 does not apply to loans greater than $50,000, § 201(b)(1), or business loans, § 201(b)(3).  This limit therefore does not apply to the present case because the principal due here is well over $50,000 and Defendants have made no showing in the record to suggest that the original debt was not a "true corporate obligation" but instead a personal loan using a corporate straw to bypass usury restrictions. *See All Purpose Finance Corp. v. D'Andrea*, 235 A.2d 808, 810-811 (Pa. 1967).  In light of their pleadings, it seems unlikely that they could.

subjects them to the interest provision of the Credit Agreement and MPA.  And the costs to collect those liabilities, including attorneys' fees, are also "Obligations" under the Credit Agreement. Finally, then, Defendants Blass-Schutz and Bucholz are liable for all of these "Obligations" under the Personal Guaranty agreement.

D.  The Althea Group Guaranty

As a final point, I find that ABDC meets its burden regarding the Althea Group Guaranty making Defendant Althea Group LLC liable to ABDC for all debts found owing by Primrose to ABDC.  Primrose has not even briefed this issue in opposition, making the facts at issue undisputed for the purposes of this motion.[22]  F.R.C.P. 56(e)(2).  It is still incumbent on the Court to find that ABDC is entitled to judgment as a matter of law.  The Continuing Guaranty and Surety Agreement between Althea Group and ABDC was signed on July 1, 2014, well into the PSAO relationship between Primrose and ABDC.  ECF 106, Ex. E.  It unambiguously applies to the whole universe of potential liabilities that Primrose might have incurred to ABDC.  *Id.*  Preface ("… with respect to all present and future obligations, indebtedness or liabilities, including without limitation, any interest thereon …"); *id.* ¶ 2 ("This Guaranty includes, but is not limited to, Indebtedness arising under successive transactions continuing, compromising, extending, increasing, modifying, releasing, or renewing obligations, payment terms, or other terms and conditions thereof, or creating new or additional Indebtedness after prior Indebtedness has been satisfied in whole or in

---

[22] Courts in this district have held that for purposes of summary judgment, "[w]here an issue of fact or law is raised in an opening brief, but it is uncontested in the opposition brief, the issue is considered waived or abandoned by the non-movant in regard to the uncontested issue." *Markert v.  PNC Financial Services Group, Inc.*, 828 F.Supp.2d 765, 773 (E.D.  Pa. 2011); *accord Walker v.  Centocor Ortho Biotech, Inc.*, No. 11–4917, 2013 WL 664204, *4 (E.D.  Pa. Feb.  25, 2013); *Anderson v.  Perez*, No.  CV 14-6747, 2015 WL 5013704 (E.D.  Pa. Aug.  24, 2015), *aff'd*, 677 F.  App'x 49 (3d Cir.  2017) (non-precedential).  Nonetheless, the 2010 Amendment to Rule 56 makes it clear that "summary judgment cannot be granted by default even if there is a complete failure to respond to the motion."  Thus, even in the context of undisputed facts, the Court must still determine whether the movant is entitled to judgment as a matter of law.  *See Jackson v. Fed.  Exp.,* 766 F.3d 189, 197-98 (2d Cir.  2014).

part.").  It was breached when Althea Group LLC refused to pay the debts owed by Primrose to ABDC.  *Id.* ¶ 3 ("In the event that [Primrose] fails to make any payment of any Indebtedness, Guarantor immediately shall cause such payment to be made after notice thereof from ABDC."). And it permits ABDC to collect attorneys' fees, costs, and expenses associated with enforcing it. *Id.* ¶ 9.  I therefore find that ABDC is entitled to judgment as a matter of law as to the enforcement of the guaranty against Defendant Althea Group.

**IV.  <u>Conclusion</u>**

For the reasons set forth above, Plaintiff's Motion for Summary Judgment will be granted in full.  An appropriate order follows.

  /s/ Gerald Austin McHugh   
United States District Judge